## MINNIE FIELDS, Respondent, v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

### Kansas City Court of Appeals, April 7, 1913.

1. **NEGLIGENCE: Street Railways: Acceptance of Passengers: Sudden Jerk.** The plaintiff sued to recover damages, for personal injuries received while boarding one of the defendant's street cars at the corner of Seventh street and Quindaro boulevard, Kansas City, Kansas. She, and two women companions, boarded the defendant's street car at that point; but while the plaintiff, who was the last passenger in line, was in the act of pulling herself up so that her weight rested on the first step, the car suddenly lurched forward and she was thrown violently around and injured. *Held,* that the plaintiff was accepted as a passenger and entitled to recover for the injuries received by the negligence of the defendant.

2. ——: ——: ——: ——. When one who has been invited to become a passenger on a street car, responds to the invitation, places himself on the car before it starts and is in a position where a sudden start of the car would imperil his safety, the operators are bound to take notice of his situation, and a sudden movement of the car, which would endanger him, would be a breach of the duty a carrier owes its passengers.

3. **INSTRUCTIONS: Sudden Starting of Car.** An instruction that fails to require the jury to find that the sudden starting of a street car was negligent, is not erroneous, because the question of negligence, or no negligence, under a statement of facts, if existent, is one for the court to determine and not for the jury.

Appeal from Jackson Circuit Court.—*Hon. W. O. Thomas,* Judge.

AFFIRMED.

*John H. Lucas* and *Chas. N. Sadler* for appellant.

*Joseph P. Aylward, I. J. Ringolsky* and *Harry L. Jacobs* for respondent.

JOHNSON, J.—Plaintiff alleges that at a time when the relation of passenger and common carrier existed between her and defendant she was injured by the negligence of defendant and prays for the recovery of her resultant damages. The answer, in effect, is a general denial. The cause is here on the appeal of defendant from a judgment of $3750, recovered by plaintiff in the circuit court. The points relied on by defendant for a reversal of the judgment are alleged errors in the rulings on evidence and instructions, misconduct of counsel for plaintiff and that the verdict is excessive.

The injury occurred January 1, 1910, at the corner of Seventh street and Quindaro boulevard in Kansas City, Kansas. A Jackson avenue electric car bound for Kansas City, Missouri, stopped on that corner at its regular stopping place for the reception and discharge of passengers. Plaintiff an unmarried woman eighteen years of age and two women companions proceeded to board the car for the purpose of becoming passengers. Other passengers boarded the car at that place and all got on in safety except plaintiff who was the last to step on the car. She made the first step with her left foot and with the aid of the handhold at the rear of the entrance, which she grasped with her left hand, pulled herself up so that her weight rested on the first step. While in that position and before she had secured a safe footing the car suddenly started forward with a jerk, followed shortly by another and plaintiff was thrown off her balance, jerked back and forth and swung around in a manner to cause the injuries we shall describe. As to the manner of her injury plaintiff testified:

"Well, they had all gotten on the car and I just got my left foot upon the step and ahold of the rod,

169 Mo. App.—40

back rod, with my left hand and stepped up on the car with that foot, the left foot, and just as I started to step up with the other foot the car started, gave one dash of power and kind of swung me back. If it had stopped then I would have got on the car, but it gave another dash of power and threw me around. There was some gentleman standing in the back vestibule, and I had on a heavy coat, a fur coat, and my hold pulled loose, his hold rather, of my arm, and the man had hold of my left arm and when his hold pulled loose he grabbed at me again, as I started around the second time, and caught me and pulled me into the vestibule.''

The negligence alleged in the petition is: ''That said injuries to the plaintiff were directly caused by the negligence of the defendants, and their agents, servants and employees, in this, that the defendants, their agents, servants and employees, in charge of said electric car, negligently and carelessly caused and permitted the same, without warning to the plaintiff, to start and move forward, and to start forward suddenly and violently, when they knew, or by the exercise of due care and diligence might have known, that the plaintiff was in the act of boarding said car, and was in a position of imminent peril stepping upward and attempting to step upon the platform or step of said electric car and that she was in danger of being thrown down and injured by the starting of said car, and that the defendants and their agents, servants and employees, in charge of said car, carelessly and negligently failed and neglected to stop said car and allow the same to remain motionless for a reasonably sufficient length of time to allow the plaintiff to get aboard the same and secure a reasonably safe foothold upon said car.

''That by reason of all of said acts of negligence and carelessness of the defendants, and their agents, servants and employees, plaintiff was thrown vio-

lently against said car while in the act of boarding the same as aforesaid, thereby receiving the following severe and permanent injuries, to-wit: . . ."

We infer from the evidence that, at first, plaintiff did not realize that she had been injured. Immediately on entering the car she had an angry colloquy with the conductor, in which she complained of his carelessness in having the car started before she had time to get on in safety and threatened to report him to the company, but she made no complaint about being injured. The conductor who, it appears, had remained inside the car while passengers were getting on, denied the charge of carelessness, saying, "I counted my passengers and they were all on," and followed this assertion with some angry comment when a male passenger interfered and ended the quarrel. Plaintiff seated herself and in a short time began to suffer pain in various portions of her body and to feel sick. She and her companions left the car at Twelfth and Main streets intending to transfer to a westbound Twelfth street car to go to the Washington hotel where plaintiff was living with her foster father. At this time she was so ill that her companions helped her into a drug store and gave her a drink of water to revive her. When the Twelfth street car arrived she was in such a helpless condition that they procured assistance to put her on the car. She became unconscious before reaching her destination and was carried to her room in the hotel where she remained unconscious three days. She was confined to her bed six weeks and after that went around on crutches for two months. It is conceded that she is a nervous wreck and a confirmed invalid but defendant denies that her condition was caused by any injury received in boarding the car and insists that it is due to natural causes, among them acute tuberculosis with which it appears she is afflicted.

Plaintiff contends, and is supported in the contention by substantial evidence, that before her injury she was in prime health and vigor; that she did not become a victim of tuberculosis until after she had become an invalid and that lodgment was given to that dreadful disease through the serious impairment of her vital forces by the consequences of her injury.

The physician who treated plaintiff thus described her condition at the time of his first visit:

"She was in her bed and in convulsions, and it was impossible to arouse her to a realization of anything, to arouse her from the unconsciousness. She was in these convulsions, she was as rigid as a board, and head bent away back and the lower limbs, the arms and hands and fingers were all stiff as could be, could not move a finger even. . . . She didn't awaken to any realization of what was going on that evening and I think it was two days, and possibly three before she did come to herself enough to know where she was and know any of her friends. . . . they (the pains she complained of) were very general, mostly at first over the left side, the head, the arm and the left side, I think as far down as the hip, and the worst of all the pains, as I remember it now, was on the right side in the lower right groin, I mean in the right groin low down. . . . I found every evidence of a rupture there . . . it was a separation of the muscles here something like I would spread my two fingers apart, with a bulging through of the bowel between that weakened point of the muscles."

"Q. Describe to the jury what her condition is physically as you know it from doctoring her since January 1, 1910. A. Well, aside from the rupture the nervous prostration has been the worst feature in the case, complete breakdown . . . she has been what I would term a physical and nervous wreck all the time. The complications I refer to were female troubles, headaches and disturbances of the heart and organs

of respiration. General weakness and frequent faint-
ing spells and occasionally a severe convulsion has
overcome her."

The cause was tried in May, 1911, seventeen
months after the injury. Two physicians were ap-
pointed by the court at that time to examine plaintiff
and were introduced as witnesses by defendant. They
state they found no evidence of a rupture but admit
that a rupture such as that described by plaintiff's
physician might have been cured in the time that had
elapsed from the injury if an operation had been per-
formed. No surgical operation was performed and the
treatment given plaintiff for the rupture consisted of
having her wear a truss. Witnesses found evidence
of nervous breakdown and of acute tuberculosis. In
their opinion these conditions were not referable to
traumatism but were due to natural causes.

We have stated enough of the evidence to give a
clear idea of the nature of the conflict over the issue
of the cause of plaintiff's condition of ill health.

The first proposition advanced by defendant for
a reversal of the judgment is that the court erred in
giving instruction numbered 1 asked by plaintiff which
assumed to cover the whole case and directed a verdict
for plaintiff on the hypothesis stated. The first ob-
jection to the instruction is that it does not restrict
plaintiff's cause to the issues made by the pleadings.
The argument of counsel for defendant is that the
gravaman of the charge in the petition "is not a sud-
den starting of the car while the plaintiff was in the
act of boarding the same, but the negligent failure to
stop the car after she was partially thereon and be-
fore she had secured a reasonably safe foothold on the
platform of the car" while the instruction "is predi-
cated upon the negligent starting of the car and not a
negligent failure to stop the car."

As we construe both the petition (from which we
have quoted the material part) and the instruction,

the theory common to both, of plaintiff's right to recover is that while she was in the very act of boarding a car which had stopped to receive her as a passenger and was in a position that would be dangerous if the car were not held stationary until that position had shifted to one of safety, the operators of the car suddenly moved it forward with enough violence to injure her. The averment "that the defendant . . . carelessly and negligently failed and neglected to stop said car and allow the same to remain motionless for a reasonably sufficient length of time to allow plaintiff to get aboard," etc., when read in the light of the context does not purport to allege a cause founded on negligent failure to stop the car after it had started with plaintiff in a dangerous position on the first step, but refers to the sudden starting of the car in leaving the stopping place where it had been held stationary for the reception of passengers.

The petition and instruction are in perfect accord and it is unnecessary to discuss the question of whether or not the claimed variance if found to be existent would be material.

Other objections to the instruction will be discussed together since we find that, in substance, they constitute an attack on plaintiff's whole case in the nature of a demurrer to the evidence.

The rule is invoked that "when a car has been stopped for a reasonable time and the signal to start is given before a person attempts to enter, then the invitation to enter is closed." Without some kind of notice prior to the signal to start, street railways are not required to anticipate that parties at or near a stopping place are intending to become passengers. [Quinn v. Railway, 218 Mo. l. c. 554; Hays v. Railway, 51 Mo. App. l. c. 445.]

When a street car stops at a regular stopping place the company impliedly extends an invitation to persons waiting there to enter the car and become pas-

sengers and the relation of carrier and passenger begins at the time such person, with the purpose of becoming a passenger, evinces by appropriate action his acceptance of the invitation. The duty devolves on the carrier of holding the car stationary a reasonable time for the passenger to board and reach a position of safety. This does not mean that the carrier must wait an unreasonable time for a dilatory passenger to get on or must wait until a passenger is seated. After waiting a reasonable time the company may close the invitation and start the car without violating any obligation to a too dilatory invitee who has not placed himself in a position of peril at the time of the withdrawal of the invitation. But where a person invited to become a passenger has responded to the invitation, has placed himself on the car before its withdrawal and is in a position where a sudden start of the car would imperil his safety, the operators are bound to take notice of his situation and any sudden movement of the car which would endanger him would be a breach of the duty a carrier owes his passengers. As we understand the evidence of plaintiff she proceeded with reasonable dispatch to board the tcar. She was the last person in line but somebody had to be the last and after allowing her to step on to the first step, defendant was bound to treat her as a passenger who had entered its vehicle at its invitation regardless of the time consumed at the stopping place. Defendant argues that the invitation had been ended before plaintiff began her first step in boarding the car but there is no evidence to support that argument. While there is no special reference in the evidence of plaintiff about a signal to start the car which also would have been the signal of the closing of the invitation to bystanders, all the facts and circumstances detailed in the evidence tend to show that no signal of that kind was given before plaintiff seized the handhold and began her ascent of the steps. The remark of the con-

ductor that he had counted his passengers and found that all were on, was equivalent to the assertion that plaintiff had reached a place of safety on the car before he gave the signal. We hold the evidence of plaintiff makes out a clear case of negligence against the conductor. The final objection to the instruction that it fails to require the jury to find that the sudden starting of the car was negligence is answered by saying that the facts embraced in the hypothesis of the instruction, if existent, would constitute negligence in law and this being true, the question of negligence or no negligence was one for the court to determine and not for the jury.

The criticism offered by defendant to the instruction given at the request of plaintiff on the measure of damages is answered by referring counsel to the opinion of this court in Madden v. Railway, 151 S. W. Rep. 489, and of the Supreme Court in Stid v. Railway, 236 Mo. 382, where a similar criticism received an adverse ruling.

The numerous objections of defendant to rulings on evidence have been examined and are found to be without merit. In the majority of these instances the record shows the court sustained defendant's objections and in the others the rulings were obviously proper. The issue of whether the injury in question or natural causes produced the pain, suffering and bodily afflictions of plaintiff is presented by all the evidence as one of fact for the jury to determine. There is nothing in the contention that it was physically impossible for plaintiff to have received injuries to her right side when her evidence shows that her weight was being supported by her left foot and left hand. It is reasonable to infer that in being jerked back and forth and swung around her right side did strike some part of the car. She suffered no broken bones and we shall concede that the external marks left on her body did not indicate serious injury, but

it does not follow that she could not have sustained grave internal injuries such as nervous shock and rupture. The evidence shows that before her injury she was a healthy, strong, young woman who performed labor which could not have been done by a weakling. In a few minutes after the accident she began to exhibit signs of nervous shock and of severe internal injuries. It is hard to reconcile the history of the case with the theory of natural cause and we hold that·the jury were entitled to draw the conclusion that the negligence of defendant transformed a healthy woman into a hopeless invalid. The evidence of the physicians appointed by the court is not wholly unfavorable to plaintiff but if it were it would not be conclusive. Expert evidence at best is but advisory and the jury were entitled to believe plaintiff's expert and lay evidence as against the testimony of disinterested experts. Where evidence is substantial the weight to be given it is always an issue for the jury to solve.

In his argument to the jury one of the attorneys for plaintiff said "Now, gentlemen of the jury, there is no doubt but that this plaintiff has consumption. All the doctors say that she has consumption. The consumption did not come from the accident, but there is no doubt if a person is confined to their bed and had this germ that it aggravates the disease, and it comes not only from this accident, but—"

This was objected to by defendant and the court sustained the objection. We might stop with the statement that defendant is in no position now to raise the question of the propriety of this argument, but we shall add that we think it was not improper. It is true defendant's experts testified that tuberculosis could not have been caused directly or indirectly by the injury plaintiff received. But they also said that the disease is caused by a germ which ordinarily a healthy body will destroy. In view of the facts that before her injury plaintiff had every appearance and indication of

perfect health and that the disease did not manifest itself until after she had passed through a prolonged period of suffering and confinement which left her vital resources and powers greatly impaired, we hold that neither counsel for plaintiff nor the jury were compelled to accept the expert opinion that there could be no casual relation between the injury and the disease. The petition does not allege that consumption was one of the results of the injury but defendant introduced into the case the issue of whether or not the disease was the cause of plaintiff's ill health and her counsel were acting within the scope of her legal rights when they met this defense with the reasonable argument that the disease itself was not an independent cause but was one of the natural results of the injury. The record discloses that the cause was tried without prejudicial error.

The judgment is affirmed. All concur.